UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Kenneth G. McDonald,<br><br>                    Plaintiff<br><br>         v.<br><br>Charles Daniels, et al.,<br><br>                    Defendants | Case No. 2:23-cv-00130-CDS-EJY<br><br>Order Screening<br>First Amended Complaint and<br>Deferring Pending Motions<br><br>[ECF Nos. 1, 8, 11, 12, 13] |

State prisoner Kenneth McDonald brings this civil-rights action under 42 U.S.C. § 1983 to redress constitutional violations that he claims to have suffered while he was incarcerated at Southern Desert Correctional Center (SDCC). *See* ECF No. 7. On June 6, 2023, I screened McDonald's original complaint, allowing some claims to proceed, dismissing others with prejudice, and dismissing the remaining claims with leave to file a first amended complaint by September 5, 2023, if he so chose. ECF No. 6. I deferred ruling on McDonald's application to proceed *in forma pauperis. Id.* at 21. And I referred this matter to the court's Pro Bono Counsel Program for the purpose of finding counsel willing to be appointed as McDonald's pro bono counsel for the limited scope of participating in the Court's Inmate Early Mediation Program. *Id.* at 20–22.

McDonald timely filed his first amended complaint (FAC). ECF No. 8. He also filed a notice about Doe defendants that I construe as a motion seeking to substitute the true names of three Doe defendants. ECF No. 10. He moves for an order requiring defendants to preserve all evidence about the matters at issue in the FAC. ECF No. 11. And McDonald moves for: (1) a temporary restraining order and a preliminary injunction requiring that he remain housed at Lovelock Correctional Center ("LCC"); (2) appointed counsel; (3) an order directing defendants to not retaliate against him; and (4) an order directing defendants to provide him medical care. ECF Nos. 12, 13.

I now screen McDonald's FAC under 28 U.S.C. § 1915A. Having done so, I find that McDonald states colorable claims under the First Amendment about retaliation, the Eighth Amendment about indifference to safety threats, and the Fourteenth Amendment Equal Protection Clause, so those claims may proceed. McDonald again fails to state a colorable claim under the First and Fourteenth Amendments about the right to access the courts, and I find that further leave to amend would be futile. So that claim is dismissed with prejudice.

I construe McDonald's notice about Doe defendants as motion to substitute the true names of three Doe defendants and grant him that relief. I defer ruling on McDonald's application to proceed *in forma pauperis* and motions to preserve discovery and for a temporary restraining order and a preliminary injunction. Finally, because the court has not yet located counsel willing to be appointed as McDonald's pro bono counsel, and this matter has been pending for some time, I give McDonald 30 days to file a notice informing the court how he wants to proceed in this action.

I.        Notice about Doe defendants

McDonald filed a notice stating that because he's been transferred to LCC, he now feels safe revealing the true names of three Doe defendants. ECF No. 10. I construe McDonald's notice as a motion seeking to substitute the true names of those defendants, and I grant him that relief. Moreland is substituted for John Doe #1, Mikeals is substituted for John Doe #2, and Tate is substituted for John Doe #3.

II.       Screening standard

Federal courts must conduct a preliminary screening in any case in which a prisoner seeks redress from a governmental entity or an officer or employee of a governmental entity. *See* 28 U.S.C. § 1915A(a). In its review, the court must identify any cognizable claims and dismiss any claims that are frivolous or malicious, or that fail to state a claim upon which relief may be granted or seek monetary relief from a defendant who is immune from such relief. *See* 28 U.S.C. § 1915A(b)(1)(2). All or part of the complaint may be dismissed sua sponte if the prisoner's claims lack an arguable basis in law or fact. This includes claims based on legal conclusions that are untenable, like claims against defendants who are immune from suit or claims of infringement of a

legal interest which clearly does not exist, as well as claims based on fanciful factual allegations or fantastic or delusional scenarios. *See Neitzke v. Williams*, 490 U.S. 319, 327–28 (1989), *superseded on other grounds by* 28 U.S.C. § 1915(e); *see also McKeever v. Block*, 932 F.2d 795, 798 (9th Cir. 1991).

Dismissal for failure to state a claim is proper only if the plaintiff clearly cannot prove any set of facts in support of the claim that would entitle him or her to relief. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999). In making this determination, the court takes all allegations of material fact as true and construes them in the light most favorable to the plaintiff. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir. 1996). Allegations of a pro se complainant are held to less stringent standards than formal pleadings drafted by lawyers, but a plaintiff must provide more than mere labels and conclusions. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *see also Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (recognizing that pro se pleadings must be liberally construed); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "While legal conclusions can provide the framework of a complaint, they must be supported with factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### III.   Screening of FAC

#### A.   McDonald's factual allegations[1]

McDonald is a 45-year-old prisoner who has been in the custody of the Nevada Department of Corrections for 28 years. When McDonald arrived at SDCC on January 27, 2021, his property was screened by Senior Correctional Officer Moran, who labeled 90 percent of it as unauthorized. McDonald checked a box on the property form indicating that he was appealing Moran's decision. The appeal went unaddressed for five months.

Among McDonald's confiscated property was legal work related to his civil-rights action styled *McDonald v. Williams*, Case No. 2:17-cv-03066-RFB-DJA (*McDonald I*). McDonald told Moran on January 27 that he needed his legal work, but she refused to let him have it upon learning it

---

[1] This is merely a summary of the allegations in the FAC, *see* ECF No. 8 at 5–42, and should not be construed as findings of fact.

3

pertained to a civil suit against NDOC officials. "[T]his had a direct impact on [McDonald's] ability to properly litigate his suit."

On June 2, 2021, McDonald was ordered to the property room where Moran pulled out the bags containing McDonald's confiscated property, removed the DOC 1517 forms from each bag and wrote on them, which effectively disrupted and stopped the administrative appeals process. Moran handed McDonald's his hot pot, radio, and religious book. McDonald asked Moran for his legal work, explaining he needed it for discovery in *McDonald I*, which had been ordered that day. Moran responded, "You won't be getting any of that back for sure." Moran purposefully destroyed the rest of McDonald's confiscated property soon after to "chill and/or stop" his litigation efforts and to "retaliate" against him.

On July 1, 6, 12, 13, 14, 16 and 21, 2021, SDCC officials prevented McDonald from sending legal mail, stating that office was closed. Other inmates were allowed to send their legal mail on these dates. McDonald filed an emergency grievance on July 14, 2021, about this issue. Tate yelled at McDonald in front of the entire tier about the grievance stating, "File more grievances and I will shake the unit down." Unable to send his discovery, McDonald was forced to settle his claims in *McDonald I*.

On July 20, 2021, McDonald submitted a request for caselaw research or to check out material at the law library. John Doe #4 denied his request stating, "No way to find this information. Do not return. Void." Other inmates received their research requests.

On July 21, 2021, McDonald had a teleconference with Deputy Attorney General Mr. Guy for a mediation conference order in his civil-rights action styled *McDonald v. Dzurenda*, Case No. 2:19-cv-01329-JAD-DJA (*McDonald II*). McDonald reached a settlement in *McDonald II* for Moran to release McDonald's property that she confiscated as unauthorized in January 2021. Consistent with that agreement, McDonald was escorted to the property room on July 26, 2021, by Caseworker Saterly. Moran acknowledged receiving a call from Mr. Guy and stated, "let's get you your property." A worried look came over Moran's face as she read McDonald's property card, and she turned to Saterly and stated, with panic in her voice, "I destroyed it." McDonald explained that Moran had not followed proper procedure: because he checked a box on the forms

appealing her determination that the property was unauthorized, it could not have been destroyed without a hearing. Moran then showcased to McDonald other prisoners' confiscated property, and he was allowed to select some of those items in settlement of *McDonald II*.

Moran's supervisors purposefully kept her in the property room beyond the two-year limit on corrections officers being assigned a certain post or area. Supervisors did so despite knowing that Moran did not adhere to the department or prison's policies and regulations regarding inmate property. Many inmates have filed grievances against Moran about property issues.

On February 8, 2022, McDonald had a teleconference with Deputy Attorney General Austin T. Barnum about *McDonald I* in which a settlement was reached. McDonald expressed his concern about SDCC Associate Warden Jennifer Nash and Moran's conduct purposefully denying him a stereo. Barnum assured McDonald that wouldn't happen.

Nine days later, McDonald was ordered to report to SDCC administration building B4. After McDonald arrived, Nash and six correctional officers surrounded him to intimidate him. During their conversation, Nash tried to steer McDonald into purchasing a stereo that she liked. McDonald responded that he was sticking with what the settlement agreement allowed.

Nash ordered McDonald to the administration building knowing that by doing so, the other inmates would label McDonald as an informant or snitch. Other inmates saw McDonald leaving the administration building alone. Inmates do not speak with prison officials without another inmate present to overhear what's being said. This prevents inmates from informing on one another. McDonald is not an informant. Prison officials know the inmates' preference not to speak with them alone.

In March 2022, McDonald ordered a boom-box stereo (Toshiba-T4-CMU500) from an outside vendor, and had it shipped to SDCC care of Nash, as she directed him to do on February 17. No other inmates settling their claims against prison officials are required to send purchases to the care of Nash. On March 22, 2022, McDonald was ordered to the property room where he was placed in a "fenced like cage." Nash appeared 15 minutes later, and told McDonald that she was

refusing to provide his stereo because it has a U.S.B. port and Bluetooth capability, which Nash claimed could allow McDonald or other inmates to access the internet.

The stereo McDonald wanted isn't prohibited by prison regulations; the same stereo is being used in the inmate commissary building. That's how McDonald decided which stereo he wanted to purchase. McDonald explained that Nash was mistaken; if Nash read the owner's manual, she'd discovery that no internet access was available to the stereo's operator. Nash wasn't convinced.

Nash held a cellphone to her chest during their conversation and McDonald saw she was recording it. Nash violated policy having her cellphone, which has internet access, on the yard. In a panicked comment, Nash told McDonald that he was wrong. But Nash was unable to cite a regulation confirming her position and quickly left.

On March 28, 2022, McDonald had a teleconference with Barnum about the matter with Nash denying him the stereo. Barnum was unable to verify Nash's claims that the stereo could permit internet access. Barnum offered two alternative stereos for McDonald to purchase, which McDonald agreed to consider. On April 8, 2022, McDonald was ordered to report to the property room where he met a corrections officer who gave him a piece of paper describing a Sony stereo and told McDonald that Nash had personally approved and dated it. McDonald then signed the paper to confirm receipt.

McDonald felt like he was being forced to purchase the stereo. The stereo that McDonald purchased—the one Nash approved—has a cassette tape with a recording function. Department and prison policies expressly prohibit inmates from having appliances with recording capabilities.

On April 29, 2022, Nash called McDonald to the administration building so she could gloat about not allowing him to have a stereo of his own choosing. Several inmates saw McDonald leave the building. Within weeks rumors began circulating through the prison that McDonald was an informant and homosexual. Corrections Officers Moreland and Mikeals helped spread these rumors. The rumors placed McDonald's life "in danger." McDonald received "multiple threats" after he was labeled an informant and homosexual.

1    Nash's conduct of repeatedly calling McDonald to the administration building and interfering with his purchasing a stereo in settlement of a civil-rights action placed an "extreme amount of stress upon [McDonald]." On December 21, 2021, doctors at Centennial Hills hospital instructed McDonald to avoid stressful situations after he experienced total heart failure/cardiac arrest a day earlier, which happened after he had a conversation with Barnum about Nash's and Moran's actions. McDonald flatlined for about 15 minutes without a heartbeat. McDonald returned to the prison from the hospital on February 17, 2022.

On January 24, 2023, McDonald filed this civil-rights action using the U.S. postal service, unaware he was able to use the court's e-filing system. One week later, other inmates, Moreland, and Mikeals directed derogatory comments and accusations to McDonald. They again called McDonald "snitch, faggot, punk ass white boy, bitch, etc." The verbal abuse was frequent and aggressive. Because McDonald did not react violently to the abuse, his friends abandoned him.

On February 3, 2023, McDonald was taken into the activity room by five corrections officers, including Mikeals, and ordered to place his hands on the wall. McDonald was told to move all his property from unit 3 to unit 5. The officers refused to allow McDonald to use a property cart. Mikeals told McDonald, "You can write the court if you want, I know what you sent out last month." Understanding that officers were reading his legal filings, McDonald remained silent. Other inmates who were also moving to different units the same day were allowed to use property carts. Inmates and corrections officers in unit 5 harassed and threatened McDonald.

On April 16, 2023, McDonald was called slurs like "faggot" and "bitch ass cracker" and accused of being a "snitch" and a "rat." McDonald called his fiancée Sandra Fowler and asked her to call the SDCC administration building and inform them that McDonald needed to be removed from the yard for his safety. Shift Commander Tate told Fowler, "Yeah, we know him. Call back tomorrow and tell it to the chaplain." This implies Tate knew that McDonald might be killed.

McDonald and his cellmate locked down that evening and heard unknown inmates yelling threats and slurs through the ceiling and ventilation system. It got so bad that McDonald pressed the button in his cell to alert the control tower that he needed help. No one responded to McDonald's calls.

On April 17, 2023, around 8:00 a.m., McDonald went into the hallway seeking protection from a corrections officer. Finding no one who could hear him over the noise of inmates in other units, McDonald returned to his cell but was attacked by about 20 inmates who repeatedly stabbed him in the neck and back. McDonald was beaten for about three minutes before the unit officer intervened. McDonald was taken to the activity room, then the infirmary, and finally by ambulance to the hospital. McDonald suffered a broken nose, fractured eye sockets, stab wounds, and lasting nerve damage and pain in his hands and arms.

### B. Analysis of McDonald's claims

Based on the allegations above, McDonald sues Charlie Daniels; Brian Williams; Hutchings; Scally; Jennifer Nash; Moran, Moreland, who has been substituted for John Doe #1; Mikeals, who has been substituted for John Doe #2; Tate, who has been substituted for John Doe #3; and numerous other John Doe defendants. ECF No. 8 at 1–3. He seeks declaratory, monetary, and injunctive relief. *Id.* at 56–57. I liberally construe the FAC as bringing claims based on four different theories of liability: (1) First Amendment retaliation; (2) First and Fourteenth Amendment denial of access to the courts; (3) Eighth Amendment indifference to safety needs; and (4) Fourteenth Amendment Equal Protection violations. I address each theory and any issues below.

#### 1. *First Amendment—retaliation*

Inmates have a First Amendment right to file grievances and pursue civil-rights litigation in the courts, "and to be free from retaliation for doing so." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012); *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005). A retaliation claim in the prison context has five elements. *See Watison*, 668 F.3d at 1114. "First, the plaintiff must allege that the retaliated-against conduct is protected." *Id.* Filing or submitting a grievance, complaint, or lawsuit about prison conditions or alleged constitutional violations is protected conduct. *Entler v. Gregorie*,

872 F.3d at 1031, 1039 (9th Cir. 2017). The form that an inmate's complaint takes—"even if verbal"—"is of no constitutional significance, and threats to sue fall within the purview of the constitutionally protected right to file grievances." *Id.*

Second, the plaintiff must allege that "the defendant took adverse action against [him]." *Watison*, 668 F.3d at 1114. "'The mere threat of harm can be an adverse action.'" *Id.* (cleaned up) (quoting *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009)). The third factor requires the plaintiff to "allege a causal connection between the adverse action and the protected conduct." *Id.* Allegations "of a chronology of events from which retaliation can be inferred is sufficient" at the screening stage. *Id.*

"Fourth, the plaintiff must allege that the 'official's acts would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Id.* (quoting *Robinson*, 408 F.3d at 568). "A plaintiff who fails to allege a chilling effect may still state a claim if he alleges [that] he suffered some other harm that is more than minimal." *Id.* (cleaned up) (quoting *Brodheim*, 584 F.3d at 1269 and *Robinson*, 408 F.3d at 568 n.11). The fact "[t]hat the retaliatory conduct did not chill the plaintiff from suing the alleged retaliator does not defeat the retaliation claim" at the pleading stage. *Id.*

And the fifth factor requires the plaintiff to allege that the defendant's retaliatory action did not advance legitimate goals of the jail. *See id.* (quoting *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985)). A plaintiff can sufficiently plead "this element by alleging, in addition to a retaliatory motive, that the defendant's actions were arbitrary or capricious, or that they were unnecessary to the maintenance of order in the institution." *Id.* (cleaned up).

McDonald arguably states a colorable First Amendment retaliation claim. McDonald alleges that Moran took adverse action against him by destroying his personal property, including legal work for pending civil-rights actions, because he filed lawsuits against prison officials and employees. McDonald was forced to settle *McDonald I* because he did not have the materials he needed to engage in discovery.

Settlement of *McDonald I* included permitting McDonald to purchase a new stereo. Nash frustrated and elongated the process of McDonald purchasing a stereo, ultimately requiring him

to purchase one that violates the prison's rule against inmates having appliances with recording capabilities. McDonald suffered extreme stress because of Nash and Moran's interference. Nash purposefully called McDonald alone to the administrative building twice to handle the matter despite knowing that inmates view other inmates who speak alone with prison administrators as snitches and informants. Other inmates saw McDonald leave the building both times.

Rumors soon spread throughout the prison about McDonald being an informant. Moreland and Mikeals helped spread the rumors. Inmates threatened McDonald with violence as a result. Moreland and Mikeals called McDonald slurs and stated he was a snitch after they learned he filed this civil-rights action. Other inmates joined and the verbal abuse and harassment increased and became more aggressive. Tate threatened McDonald in front of his entire housing unit that he would perform a unit shakedown if McDonald filed anymore grievances. McDonald was ultimately attacked by 20 inmates because Nash, Moreland, Mikeals, and Tate insinuated or stated that McDonald was a snitch, and Moreland and Mikeals instigated other inmates to harass and threaten him. The First Amendment retaliation claim may therefore proceed against Moran, Nash, Moreland, Mikeals, and Tate.

### 2. *First and Fourteenth Amendment—right to access courts*

Prisoners have a constitutional right to access the courts. *Lewis v. Casey*, 518 U.S. 343, 346 (1996). Courts "have traditionally differentiated between two types of access to courts claims: those involving prisoners' right to affirmative *assistance* and those involving prisoners' rights to litigate without active *interference*." *Silva v. Di Vittorio*, 658 F.3d 1090, 1102 (9th Cir. 2011), *overruled on other grounds as explained in Rickey v. Dahne*, 807 F.3d 1202, 1209 n.6 (9th Cir. 2015). Regardless of whether the plaintiff's access-to-courts claim is about inadequate assistance or active interference, the plaintiff must show that he or she has suffered an "actual injury." *Lewis*, 518 U.S. at 349; *accord Silva*, 658 F.3d at 1104 (recognizing that dismissal of pending civil suits was "an actual injury"). The actual-injury requirement requires a plaintiff to "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded." *Lewis*, 518 U.S. at 353.

For an inadequate-assistance-claim, actual injury of a legal claim is limited to nonfrivolous direct criminal appeals, habeas corpus proceedings, and § 1983 actions. *Id.* at 353 n.3, 354–55. The right to affirmative assistance is further "limited to the pleading stage." *Silva*, 658 F.3d at 1102. For an active-interference claim, actual injury of a legal claim includes direct criminal appeals, habeas corpus proceedings, § 1983 actions, and "other civil actions . . . that have a reasonable basis in law or fact." *Id.* (cleaned up). The right to litigate without active interference by prison officials extends beyond the pleading stage. *Id.* at 1103–04 ("we see no reason why such a right would not exist throughout a prisoner's litigation efforts").

To properly plead the actual-injury element of an access-to-courts claim, the plaintiff must identify the underlying cause of action "in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued," and describe the official acts frustrating or impeding that litigation. *Christopher v. Harbury*, 536 U.S. 403, 415–17 (2002). And for a backward-looking claim—one that seeks a remedy for a lost opportunity to present a legal claim—"the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." *Id.* at 404.

McDonald alleges that he was forced to settle his claims in *McDonald I* after prison employees refused to let him send his discovery materials on several occasions, and the law librarian denied his research request. McDonald alleges these actions happened in July 2021. McDonald's right-to-access-courts claims is therefore backward-looking and based on active-interference by prison officials. The Court is not aware of any Ninth Circuit or U.S. Supreme Court decision holding that settling a claim can constitute an actual injury for court-access purposes. Because this case is at the screening stage, I assume without deciding that settlement can be an actual injury.

But there are no factual allegations about the discovery materials McDonald contends he was not able to send or how his inability to send that discovery impacted his decision to settle the case. McDonald does not identify the claims he settled in *McDonald I*. And there are no factual allegations about what McDonald lost when he settled his lawsuit because of prison officials' interference. This is McDonald's second attempt to state a right-to-access claim, and he has failed

to do so. Moreover, McDonald's vague allegations that prison officials thwarted his discovery and motion efforts in July 2021 are undermined by the record in *McDonald I*.[2]

In that case, McDonald successfully moved for a discovery extension on July 20, 2021. *McDonald I*, ECF Nos. 84, 98. Shortly before the extended discovery deadline expired on November 29, 2021, McDonald filed several motions to compel the defendants to provide more fulsome responses to some of his discovery requests. *Id.* at ECF Nos. 107 to 114. Defendants responded with points and authorities supporting their position that the motions should be denied. *Id.* at ECF No. 116. And three weeks later, the parties stipulated to dismiss *McDonald I* with prejudice, stating they resolved the matter in its entirety. *McDonald I*, ECF Nos. 117, 118. Considering the foregoing, I find that additional leave to amend would be futile. The First and Fourteenth Amendment right-to-access-courts claim is therefore dismissed with prejudice.

### 3.   *Eighth Amendment—indifference to safety needs*

"Prison officials have a duty to take reasonable steps to protect inmates from physical abuse." *Hoptowit v. Ray*, 682 F.2d 1237, 1250 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). To establish a violation of this duty, the plaintiff must show that prison officials were deliberately indifferent to serious threats to the inmate's safety. *Farmer. v. Brennan*, 511 U.S. 825, 834 (1970). To meet this standard, the plaintiff must show that "the official [knew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." *Id.* at 837. The plaintiff can rely on circumstantial evidence to show the prison official knew about the risk. *Id.* at 842.

McDonald arguably states a colorable Eighth Amendment claim about indifference to threats other inmates posed to his safety. McDonald alleges that Nash purposefully called him alone to the administrative building twice to handle the matter of purchasing a stereo despite knowing that inmates view other inmates who speak alone with prison administrators as snitches and informants. Other inmates saw McDonald leave the building both times.

---

[2] I take judicial notice of this court's online docket records, which may be accessed by the public online at pacer.uscourts.gov or without a Pacer login and password in the Clerk's Office during regular business hours. Nev. LR IC 1-1(i).

Rumors soon spread throughout the prison about McDonald being an informant. Moreland and Mikeals helped spread the rumors. Inmates threatened McDonald with violence as a result. Moreland and Mikeals called McDonald slurs and stated he was a snitch after they learned he filed this civil-rights action. Other inmates joined and the verbal abuse and harassment increased and became more aggressive. Tate threatened McDonald in front of his entire housing unit that he would perform a unit shakedown if McDonald filed anymore grievances.

After inmates' verbal harassment and threats increased in frequency and aggression, McDonald asked his fiancée Sandra Fowler to contact prison administrators to move him to another yard for his safety. Fowler spoke with Tate, who acknowledged he knew McDonald and said to raise the issue tomorrow with the chaplain. McDonald and his cellmate tried to get help from corrections officers that evening by pressing the button in their cell, but no one responded. The prison does not have intercoms in the cells, only buttons to alert officers in the tower that help is needed.[3] McDonald tried to get help from corrections officers the next morning but was violently assaulted when he returned to his cell after failing to get anyone's attention. McDonald was seriously injured in the attack.

Liberally construed, the allegations arguably state that McDonald was attacked by other inmates because Nash, Moreland, Mikeals, and Tate insinuated or stated that McDonald was a snitch, and Moreland and Mikeals instigated other inmates to harass and threaten him. These allegations are sufficient to state a colorable claim for screening purposes. *See Valandingham v.*

---

[3] McDonald might be attempting to state an official-capacity claim for injunctive relief against supervisory or administrative defendants for this constitutional tort under the theory that a policy caused his injury. McDonald fails to state a colorable claim under this theory. McDonald's bare conclusion that cells contain call-buttons instead of intercoms because the department or prison has a policy against intercoms is not enough to plausibly allege such a policy exists, or that any of these defendants is responsible for enacting or continuing it. McDonald does not seek an affirmative injunction requiring department or prison to adopt and apply a policy of installing intercoms in the cells at SDCC. And a claim for that injunctive relief is likely moot because McDonald has been transferred to another prison. *See Preiser v. Newkirk*, 422 U.S. 395, 402–03 (1975) (holding that a claim for injunctive relief was moot after the prisoner had been returned to a medium security prison and would be eligible for parole within days of decision); *Johnson v. Moore*, 948 F.2d 517, 519–22 (9th Cir. 1991) (holding that a claim for injunctive relief related to a prison's policies is moot where a prisoner has been transferred to another facility and shows no reasonable expectation of return); *see also Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (explaining that exception to mootness when case is capable of repetition yet evading review is limited to exceptional circumstances where there is a reasonable expectation that the same complaining party would be subject to the same action again); *Reimers v. State of Or.*, 863 F.2d 630, 632 (9th Cir. 1988) (explaining that "[c]ourts are reluctant to invoke [the exception to mootness] when the possibility of recurrence for the [litigant] depends upon his own wrongdoing").

*Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989) (holding that inmate stated a cause of action when he alleged that prison officials labeled him a "snitch" with the intent of having him killed by other inmates). But McDonald's bare allegation that Fowler called "SDCC's Administration" before the attack to warn about threats to McDonald's safety falls well short of stating that NDOC Director Charles Daniels, NDOC Associate Director Brian Williams, SDCC Warden Hutchings, or SDCC Associate Warden Scally knew about the call or Tate's response, failed to reasonably respond, and are thus liable for this constitutional violation in a supervisory capacity. *See Hyde v. City of Willcox*, 23 F.4th 863, 874 (9th Cir. 2022) (explaining that supervisors can be held liable under § 1983 for only (1) "their own culpable action or inaction in the training, supervision, or control of [their] subordinates;" (2) "their acquiescence in the constitutional deprivation of which a complaint is made; or" (3) "for conduct that showed a reckless or callous indifference to the rights of others") (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000)). The Eighth Amendment safety-threats claim may therefore proceed against Nash, Moreland, Mikeals, and Tate.

    4.    *Fourteenth Amendment Equal Protection Clause*

The Equal Protection Clause of the Fourteenth Amendment is essentially a direction that all similarly situated persons be treated equally under the law. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state an equal-protection claim, a plaintiff must allege facts demonstrating that defendants acted with the intent and purpose to discriminate against him based upon membership in a protected class, or that defendants purposefully treated him differently than similarly situated individuals without any rational basis for the disparate treatment. *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The Ninth Circuit explained in *SmileDirectClub, LLC v. Tippins* that "a class-of-one plaintiff must be similarly situated to the proposed comparator in all material respects." 31 F.4th 1110, 1123 (9th Cir. 2022).

When analyzing an equal-protection claim, the courts "must first determine the appropriate level of scrutiny to be applied. If the rule disadvantages a suspect class or impinges upon a fundamental right, the court will examine it by applying a strict scrutiny standard. If no

such suspect class or fundamental rights are involved, the conduct or rule must be analyzed under a rational basis test." *Giannini v. Real*, 911 F.2d 354, 358 (9th Cir. 1990).

McDonald arguably states a colorable Fourteenth Amendment Equal Protection Clause claim based on a class-of-one theory. McDonald alleges that Moran singled him out from other inmates when she destroyed his legal work. Moran's action was irrational because she didn't follow the prison's policies about inmate property, like processing his appeal, and destroyed McDonald's legal work to retaliate against him. Like McDonald, other inmates who received their legal work back from Moran were in the general population, pursuing civil litigation in the courts, and had their property confiscated as unauthorized. Liberally construed, these allegations arguably state that Moran treated McDonald differently than other similarly situated inmates without a rational basis for doing so. But McDonald's remaining allegations, including that other inmates in his housing unit were allowed to send legal mail during the dates he was not, fail to plausibly state that McDonald is like those inmates in all material respects. The Fourteenth Amendment Equal Protection Clause claim can therefore proceed against only Moran.

### IV.     Plaintiff must file notice about how he wants to proceed.

Prisoner civil-rights cases under 42 U.S.C. § 1983 generally require significant time and resources to resolve. These costs are perhaps most acutely felt by incarcerated plaintiffs who understandably want swift resolution for alleged constitutional violations but often lack the funds needed to retain an attorney to prosecute their claims. To help minimize these costs, the court created the Inmate Early Mediation Program, in which eligible § 1983 cases are sent to mediation after the court screens the complaint. Defendants in cases that the court has referred to its mediation program have the right not to make any settlement offers, and plaintiffs have the right not to accept settlement offers. When mediation does not appear likely to be productive and save resources, the court may choose to remove a case from the program or immediately put the case on the normal litigation track.

I have now screened McDonald's FAC, allowing some claims to proceed and dismissing the remaining claim with prejudice. This action is eligible to participate in the court's mediation program, and this appears to be a case where both sides could have productive settlement

discussions and save resources. Previously I referred this action to the court's Pro Bono Counsel Program for the purposes of finding counsel willing to be appointed McDonald's pro bono counsel for the limited scope of participating in the court's mediation program. Despite diligent efforts, the court has not located counsel willing to be appointed McDonald's pro bono counsel.

McDonald has adequately communicated the basis of his claims and the facts supporting them to the court, and thus appears capable of participating in the court's mediation program himself. Considering the foregoing, and to move this action forward, I give McDonald 30 days to file a notice stating if he wants to either (1) participate without counsel in the mediation program or (2) proceed onto the litigation track. If McDonald elects to participate without counsel in the court's mediation program, I will vacate my order referring this action to the pro bono counsel program, refer this action to the court's mediation program, and defer ruling on the application to proceed *in forma pauperis*. If the parties reach a settlement during the mediation process, McDonald will not be required to pay the $350 filing fee. If McDonald elects to proceed onto the normal litigation track, then the court will grant his application to proceed *in forma pauperis* and order him to perfect service upon defendants under Federal Rule of Civil Procedure 4.

V.      Conclusion

It is therefore ordered that a decision on McDonald's application to proceed *in forma pauperis* [ECF No. 1], motion to preserve evidence [ECF No. 11], and motions for a temporary restraining order and a preliminary injunction **[ECF Nos. 12, 13] are DEFERRED**.

It is further ordered that the First Amendment retaliation claim may proceed against Moran, Jennifer Nash, Moreland, Mikeals, and Tate.

It is further ordered that the First and Fourteenth Amendment right-to-access-courts claim is dismissed with prejudice because additional leave to amend would be futile.

It is further ordered that the Eighth Amendment safety-threats claim may proceed against Jennifer Nash, Moreland, Mikeals, and Tate.

It is further ordered that the Fourteenth Amendment Equal Protection Clause claim may proceed against Moran.

It is further ordered that Charlie Daniels, Brian Williams, Hutchings, and Scally are dismissed without prejudice from this action.

It is further ordered that McDonald has until **May 3, 2024**, to file a notice with the court stating if he wants to either (1) participate without counsel in the court's Inmate Early Mediation Program or (2) proceed onto the normal litigation track.

The Clerk of the Court is directed to add Moreland to the docket as a defendant substituted for John Doe #1, Mikeals as a defendant substituted for John Doe #2, and Tate as a defendant substituted for John Doe #3.

The Clerk of the Court is further directed to update the docket to reflect that the plaintiff's name is Kenneth G. McDonald.

The Clerk of the Court is further directed to send plaintiff Kenneth McDonald a courtesy copy of his first amended complaint (ECF No. 8).

Dated: April 3, 2024

_____
Cristina D. Silva
United States District Judge